IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ROSCOE DOUGLAS,

        Plaintiff,

vs.                                      CASE NO. 1:10-cv-8-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits pursuant to Title II of the Social Security Act. (Doc. 1.) The Commissioner has answered (Doc. 13), and both parties have filed briefs outlining their respective positions. (Docs. 18 & 22.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

      Plaintiff protectively filed concurrent applications for a period of disability, disability insurance benefits, and supplemental security income under Title II and Title XVI on September 10, 2003, alleging a disability onset date of April 23, 1999. (R. 29-32, 80-83, 488, 573.) These applications were denied initially on May 7, 2004 and upon reconsideration on January 25, 2006. (R. 29-32, 467-81, 488.) Plaintiff timely pursued

his administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ") (R. 47.)  A hearing was held before ALJ Douglas Walker on March 13, 2007 and ALJ Walker denied Plaintiff's claims in a decision dated August 9, 2007.  (R. 26-27, 47, 467-81.)

On May 13, 2008 the Appeals Council vacated ALJ Walker's decision and remanded the case for further proceedings due to an inaudible recording of the administrative hearing.  (R. 482-84.)  On remand the ALJ was instructed to (i) consider additional evidence regarding an impairment related to Plaintiff's upper left extremity, (ii) further evaluate Plaintiff's subjective complaints, (iii) give further consideration to Plaintiff's residual functional capacity ("RFC") and (iv) obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. (R. 483-84.)  A supplemental hearing was conducted on September 17, 2008 before ALJ Douglas W. Abruzzo and ALJ Abruzzo issued a decision denying Plaintiff's claims on December 31, 2008.  (R. 488-504.)

At this point Plaintiff's case diverged procedurally from the normal Social Security action.  The Appeals Council remanded the Plaintiff's Title XVI claims on November 20, 2009 with instructions to the ALJ to evaluate a treating source opinion that the ALJ had not previously considered.[1]  (R. 505-07.)  On that same day, the Appeals Council also denied Plaintiff's request for review of his claim for disability and disability insurance benefits under Title II.  (R. 544-47.)  This bifurcated Plaintiff's claims

---

[1] The Appeals Council noted in the decision remanding Plaintiff's Title XVI claims that "[a] separate action is being taken on the claim for a Period of Disability and Disability Insurance Benefits based on the evidence through the date last insured of December 31, 1999." (R. 506.)

2

so that ALJ Abruzzo's denial of Plaintiff's claims became the final decision of the Commissioner, but only with respect to Plaintiff's Title II claim.[2]  Plaintiff then appealed to this Court.  (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[4]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[5] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if

---

[2] The Appeals Council's decision noted that "[t]his letter is only about your claim for Title II disability insurance benefits" and "[t]his means that the Administrative Law Judge's Decision is the final decision of the Commissioner of Social Security in your case."  (R. 544.)

[3] *See* 42 U.S.C. § 405(g) (2000).

[4] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[5] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

[6] <u>Foote</u>, 67 F.3d at 1560; *accord,* <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); <u>Parker v. Bowen</u>, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[11]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[12]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[13]  Fourth, if a claimant's impairments do not prevent him from doing past

---

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

[12] 20 C.F.R. § 404.1520(c).

[13] 20 C.F.R. § 404.1520(d).

relevant work, he is not disabled.[14]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[17]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of

---

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[17] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[18] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

exertion."[19]   In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21]   Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[22]   Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  <u>SUMMARY OF THE RECORD</u>

The Plaintiff challenges ALJ Abruzzo's findings with respect to ALJ Abruzzo determination at Step Four that work Plaintiff performed while on work release from prison was past relevant work and ALJ's Abruzzo's conclusion as to Plaintiff's credibility. Tthe Court will, therefore, focus its discussion of the record on those issues.

### A.    <u>Personal Background</u>

Plaintiff born on January 5, 1957 was 51 years old as of the date of his September 17, 2008 administrative hearing.  (R. 834.)  Plaintiff completed 12 years of

---

[19] <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* <u>Jones v. Apfel</u>, 190 F.3d 1224, 1229 (11th Cir. 1999); <u>Walker</u>, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[20] <u>Walker</u>, 826 F.2d at 1003.

[21] <u>Wolfe</u>, 86 F.3d at 1077-78.

[22] *See id*.

schooling and graduated from high school.  (R. 834.)  Plaintiff last worked in 2007, when he was on work release from prison. Plaintiff was not working at the time of his administrative hearing.  (R. 838, 851.)

**B.**     **Evidence Considered By ALJ Abruzzo**

The majority of the medical evidence considered by ALJ Abruzzo consisted of medical records from Plaintiff's visits to various doctors and hospitals over an approximately 15 year period.  Several consulting physicians also completed disability evaluations and physical RFC assessments of Plaintiff which ALJ Abruzzo also relied upon in making his determination that Plaintiff was not disabled as of April 23, 1999.

While the Court will summarize briefly this medical evidence a majority of this evidence post-dates December 31, 199, the date Plaintiff was last insured and therefore the medical evidence only has marginal relevance.  Specifically, in order for Plaintiff to succeed on his Title II claim in this case, he must establish a disability as of December 31, 1999, Plaintiff's date last insured for Title II purposes.  The Court will first review the medical evidence before 1999 and then briefly address the medical evidence after the date last insured.

**1.**     **Pre-1999 Medical Evidence**

Plaintiff has had a history of lower back pain since as early as 1994.  Plaintiff visited Family Medical Practice in Cross City, Florida several times in February, March and April 1994 complaining of lower back pain caused by the heavy lifting and twisting that Plaintiff performed as a part of his job at Overstreet Mulching.  (R. 330-36.) Several months later Plaintiff was awarded temporary total disability workers

7

compensation benefits for a work-related lower back injury that he suffered on June 9, 1994 while lifting 55-60 pound pallets at work at Overstreet Mulching.  (R. 72, 249.)

Plaintiff was referred to neurologist Dr. Jeffrey Klein, M.D. in connection with his lower back injury.  Dr. Klein's neurological examination of Plaintiff on August 24, 1994 reflected decreased sensation to pin prick on the left from C6 to C8 and from L5 though S1. Musculoskeletal examination reflected point tenderness of the lower cervical spine and lumbosacral spine diffusely.  (R. 249-50.)  Cervical MRI exams on September 8, 1994 reflected minimal bulging of the discs at C3-C4, C4-C5, and some mild disc bulging at C5-C6, but no signs of spinal stenosis.  (R. 221.)  An MRI of the lumbar spine performed the same day showed prominent central disc bulging and moderate to severe spinal stenosis at L4-L5 while there was more diffuse disc bulging and no spinal stenosis at L5-S1.  (R. 221.)

Plaintiff was also referred to Dr. Kipp Kennedy, M.D. at the Gainesville Orthopaedic Group in Gainesville, Florida by Dr. Klein.  Dr. Kennedy's progress notes from a physical exam on November 22, 1994 reflect that Plaintiff was able to squat and rise with only mild to moderate discomfort and that examination of his spine revealed a normal contour of the cervical, thoracic and lumbar spine.  (R. 211-13.)  Dr. Kennedy's progress notes from December 20, 1994 reflect that Plaintiff was still suffering from pain in his neck and back, but noted that Dr. Kennedy's review of Plaintiff's MRI lumbar spine and cervical spine scans from September of that year showed no evidence of degenerative changes in the cervical spine and some degenerative changes at L4-5 that were "no[t] atypical for the patient's age."  (R. 210.)

Plaintiff reported to the ER at North Florida Regional Medical Center in

8

Gainesville on December 22, 1994 complaining of increasing back pain after having been to his physician earlier in the day for myelogram and post myelogram CT scans. (R. 201.)  Those CT scans showed "a mild disk bulging that is generalized at L4-L5 without focal disk herniation and without evidence of nerve root compromise or nerve root entrapment."  (R. 201.)  Progress notes from Dr. Kennedy's review of Plaintiff's December 1994 CT scans reflected Dr. Kennedy's assessment that Plaintiff did not show signs of significant stenosis, and that there "was a mild stenosis relative to the main canal at L4-5 but not causing significant neural impingement."  (R. 209.)

Plaintiff's workers compensation benefits for his lower back injury were terminated as of January 6, 1995 because a "detailed field investigation on Mr. Douglas ... found several locations where he worked for 'CASH' while still collecting TTD [total temporary disability] payments & supposedly unable to work" according to a written report from the Florida Division of Workers' Compensation.  (R. 77.)

Plaintiff visited the North Florida Regional Medical Center ER again on July 12, 1995 complaining of severe lumbar back pain that had originated when Plaintiff had twisted while he was on a ladder cutting down a tree limb.  (R. 252.)  The progress notes from that visit reflect that although Plaintiff "still complained of severe pain, he was able to get off the back board and ambulate to the bathroom without any limp whatsoever," that "he was able to hop off of the stretcher with no apparent discomfort or restriction" and that "[h]e was ambulating without any limp or any other obvious pain." (R. 253.)  A CT scan of Plaintiff's lumbar spine taken that day revealed "slight narrowing of the L4-5 disc space ... with small vertebral osteophytes, consistent with minimal degenerative disc disease" but was "[o]therwise unremarkable."  (R. 254.)

9

Plaintiff's medical history during this time also reveals substantial suspicion on the part of Plaintiff's medical providers with respect to Plaintiff's possible abuse of prescription drugs.  Plaintiff visited Dr. Klein again on February 9, 1995 and Dr. Klein noted that Plaintiff "appears to be dependent on excessive narcotics" and referred Plaintiff to a psychiatrist "[b]ecause of his dependence on narcotics."  (R. 214.)  On October 15, 1996 John Knight, a certified physician assistant at Family Medical Practice in Cross City, wrote that Plaintiff has a prior medical history of "substance abuse, drug dependence and abuse of street drugs."  (R. 297.)  A progress note written by Dr. Louis C. Jensen, M.D. of Family Medical Practice on a December 7, 1996 visit states that Plaintiff is "a chronically disabled man with a lot of neck pain that people have thought was a Rx drug overuser."  (R. 292.)  On January 9, 1997 Dr. Jensen wrote that Plaintiff "has chronic neck and back pain that some people thought he has a pretty bad drug abuse history."  (R. 290.)  A progress note from February 17, 1997 written by Dr. Jensen also reflects that Plaintiff and his wife were in the county jail for stealing prescription medication and writing checks on the account of an elderly woman, that Plaintiff "has been getting medication from other pharmacies" and that "will O/C all sedatives and narcotic pain medication for this man."  (R. 290.)

The last medical evidence in the record prior to Plaintiff's alleged disability onset date of April 23, 1999 or date last insured of December 31, 1999 appears in the form of progress notes from a October 1, 1998 visit to Family Medical Practice.  (R. 285.)  Plaintiff presented with a rash and stated "that over this past weekend he did do some painting as well as moving large amounts of wood that were out in the woods."  (R. 285.)

10

## 2.    Post-1999 Medical Evidence

The vast majority of the medical evidence in the record deals with Plaintiff's

medical history from 2000 onward.  According to CT scans of Plaintiff's lumbar spine

performed on December 12, 2000 at the Diagnostic Imaging Center in Gainesville

Plaintiff had a slight loss of disc height at L3-L4 and the L5-S1 disc space "probably"

also showed some loss of height, but the latter disc space was poorly imaged.  (R.

452.)  Dr. Michael Parker, M.D.'s conclusion was prominent straightening of the normal

lumbar lordosis, which is usually associated with muscle spasm, and mild discogenic

disease at L3-L4, L4-L5 and probably L5-S1.  (R. 452.)

On April 25, 2002 Plaintiff visited Dr. Jesse Lipnick, M.D. of Rehabilitation

Medicine Associates, P.A in Chiefland.  Plaintiff self-reported that he was suffering from

severe pain that was 10 on a scale of 1-10, but Dr. Lipnick noted in the progress notes

that Plaintiff only appeared to be in moderate distress.  (R. 400-02.)  Dr. Lipnick

performed nerve conduction studies and electromyography on a July 9, 2002 visit,

which reflected moderate bilateral median nerve entrapments at the transverse carpal

ligaments but no evidence of peripheral neuropathy or radiculopathy.  (R. 394-99.)

Plaintiff reported to Shands Hospital at the University of Florida ("Shands") in

Gainesville on February 17, 2003 complaining of progressive numbness in his upper

extremities, weakness in his arms and legs and neck and back pain.  (R. 370.)  MRI

scans of his cervical spine showed relatively advanced spondylitic myeolopathy with

canal stenosis and moderate cord compression from C3 to C7.  (R. 370.)  On February

26, 2003 a cervical laminectomy and fusion with instrumentation from C3 to T1 surgical

procedure was performed without complications on Plaintiff's spine by Dr. Jeffrey Henn and Plaintiff was ambulating without any problems soon after the surgery.  (R. 372-75.)

On a visit to Dr. Henn on July 31, 2003 Plaintiff reported that he had reinjured his neck while incarcerated and that he was suffering from neck pain.  Dr. Henn noted that "[o]verall, Mr. Douglas is doing quite well" and that "[o]n examination he looks well with good strength in upper and lower extremities."  (R. 392-93.)  Plaintiff again reported to the Shands ER on March 18, 2004 complaining of neck pain and injury, the source of which Plaintiff stated was "picking up heavy items" the day before.  (R. 405, 408.)

A physical examination of Plaintiff performed in April 2004 by Dr. Lance I. Chodosh, M.D. for the Florida Department of Health's Division of Disability Determinations reflected that Plaintiff's physical condition was not nearly as disabling as Plaintiff reported.  (R. 432-435.)  Dr. Chodosh noted that, although Plaintiff exhibited moderate pain behavior, his spinal function appeared to be fair and that, although Plaintiff appeared to have a mildly spastic gait, he was also able to walk reasonably well.  (R. 433, 435.)  Based on the objective evidence, Dr. Chodosh opined that Plaintiff "is physically able to walk and stand to at least a moderate extent.  He is physically able to sit in a normal fashion.  He is able to bend to a moderate extent, and can lift and carry at least 25 pounds.  He is probably able to squat, kneel, and crawl occasionally. He is physically able to handle objects of moderate size and weight."  (R. 435.)

Plaintiff also continued to exhibit signs of possible abuse of narcotics years after his treating physicians had first raised questions about Plaintiff's abuse of narcotics as far back as 1995.  Plaintiff reported to the Dixie County Health Department with complaints of neck and lower back pain on April 15, 2004 and the progress notes from

that visit reflect that Plaintiff was informed that narcotics could no longer be prescribed for him on a chronic basis.  (R. 450.)  In June 2004 the progress notes from another visit to the Dixie County Health Department reflected that Plaintiff was not honest about going to vocational rehabilitation and expressed concern that Plaintiff was abusing narcotics.  (R. 448-49.) The medical treatment provider specifically stated that he or she was "very concerned about what else the pt is not telling the truth about."  (R. 449.)

In May 2005, when Plaintiff was incarcerated, he was examined at Shands for an abnormal mass on the left side of his neck.  (R. 798-99.)  Plaintiff admitted that the mass had been present on his neck for upwards of 10 years.  (R. 798.)  The progress notes for a follow-up visit in July reflect that masses of this type "can be seen in patients who are of [sic] using drugs intravenously injecting in the neck."  (R. 795.)  A CT scan of the mass, which was determined to be a brachial cleft cyst, confirmed that it was likely of infectious etiology.  (R. 796.)  The cyst was then surgically removed on August 22, 2005.  (R. 789-90.)  The mass, however, was not completely excised and continued to grow after the surgery.  (R. 783-88.)   Plaintiff was prescribed pain medication for what he reported as severe pain from the left neck mass and asked for Percocet, but was "advised that it is felt that he has been taking too many narcotics for the amount of pain that would be expected for his type of surgery."  (R. 777.)  The rest of the mass was successfully surgically removed on November 14, 2005.  (R. 777.)

Plaintiff visited the ER at Shands again on January 5, 2006 complaining of neck pain, chest pain, and withdrawal and reporting that he had run out of his pain medication the previous day.  (R. 769-70.)  Plaintiff was given a pain control shot and was discharged with a final diagnosis of narcotic withdrawal and chest pain.  (R. 767,

769-75.)  The progress notes from a follow-up visit the next day to Dr. Douglas Villaret, the otolaryngologist, who removed the mass on Plaintiff's left neck area, reflect that "Patient continues to have excessive amounts of pain that are not common with this procedure."  (R. 767.)

Plaintiff reported to the Shands ER on February 2, 2007 complaining of neck and back pain after having falling down a flight of stairs the previous day.  (R. 655.)  A CT scan of Plaintiff's spine showed that the screws from his laminonectomy surgery in 2003 had loosened a fraction, but there was no evidence of soft tissue swelling, no fractures were present and no definite findings to suggest infection.  (R. 765.)  MRI scans also were normal. Plaintiff was prescribed Darvocet for his pain and was discharged without a collar.  (R. 655-58.)

On a follow-up appointment on February 27, 2007, Dr. Dean Lin determined that some of the screws from Plaintiff's 2003 surgery had slightly loosened, and Dr. Lin wrote in the progress notes that "[t]he hardware appears to be stable and well within bone from C3 down to C6 with good fusion mass present there" with only a "slight loosening" of the screws at T1.  (R. 653-54, 803.)  Dr. Lin also noted, however, that Plaintiff was also advised that he would not be prescribed any further pain medications or muscle relaxants.  (R. 653.)  On another follow-up visit on March 20, 2007 Dr. Lin determined that it would be unwise to do anything with regard to the loosening of the screws at the T1 level.  (R. 651-52.)  Dr. Lin also wrote in the progress notes for that visit that "I have emphasized to him that he needs to be seen by Pain Clinic in order to let the pain settle down and I have told him that I will not give him any more prescriptions for narcotic pain medications or muscle relaxants."  (R. 651-52.)

14

On October 5, 2007 Plaintiff again reported to the Shands ER complaining of aching pain in his neck and left arm and left arm weakness that had started approximately six days before.  (R. 643.)  Examination reflected that he had marked impairment in fine finger movements and extension of the fingers and wrists and diminished reflexes in the left upper extremity.  (R. 643.)  The preliminary conclusion was that there was a possible issue with Plaintiff's left brachial plexus or radial/median nerves.  (R. 644.)  An MRI of Plaintiff's brachial plexus was performed and did not show any plexopathy.  (R. 662.)  MRI's of his neck and head demonstrated "good cord decompression without current compression and without signal change in the cord" and "showed stable post surgical changes" with "[n]o evidence of residual cervical cord compression or signal change within the cord."  (R. 644, 664-69.)

Dr. Edward Valenstein, M.D., Chairman of the Neurology Department at Shands, wrote in a letter dated March 28, 2008 to Dr. Peter Gallogly, Plaintiff's pain management specialist at the Lafayette County Health Department, that Plaintiff's likely diagnosis was brachial plexopathy. (R. 660-61.)   Dr. Valenstein opined that "I do not think his current weakness is related to his known spine disease" and that "[i]t is difficult for me to estimate the degree of disability since most of it is based on pain rather than weakness."  (R. 661.)  Dr. Valenstein also expressed concern regarding Plaintiff's reliance on pain medications, writing that "[t]here is at least a theoretic concern about reduction of pain threshold on chronic opiates" and that "I think that he should be encouraged to reduce the opiate medication if at all possible."  (R. 661.)

Dr. Lance I. Chodosh conducted another disability determination of Plaintiff on October 7, 2009.  (R. 699-703.)  Despite Plaintiff's claims of disabling pain and virtual

15

paralysis in his left hand, Dr. Chodosh stated in his written report that Plaintiff

"presented a vague, and not very credible history."  (R. 699.)  Dr. Chodosh's conclusion

was that Plaintiff suffered from "chronic pain and alleged paralysis of left arm and hand,

but without signs of physical impairment" and also stated that "[i]t is my opinion, based

only on objective evidence, that this person is able to stand, walk, sit, stoop, squat,

kneel, lift, carry, handle objects, see, hear, and speak normally."  (R. 702.)

### 3.    Physical RFC Assessments

A number of physical RFC assessments performed on Plaintiff between 1995

and 2009 are also included in the record.  A physical RFC assessment performed on

July 25, 1995 by Dr. J.J. Green, M.D. concluded that Plaintiff could occasionally lift

and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for six

hours in an eight hour work day, sit for about six hours in an eight hour work day, and

had an unlimited ability to push and/or pull.  (R. 255-262.)  In support of this conclusion,

Dr. Green noted that Plaintiff's MRI scans showed few bulges and no significant motor

or sensory changes.  (R. 256.)  Another physical RFC evaluation performed by Dr.

David Guttman, M.D. on January 24, 1996 was identical, except that Dr. Guttmann

concluded that Plaintiff could frequently lift and/or carry 25 pounds and stand and/or

walk for four hours in an eight hour work day.  (R. 276-83.)

Another physical RFC evaluation performed by Dr. Robert Steele, M.D. on July

30, 2002 reached the identical conclusions to Dr. Green's assessment.  (R. 362-369.)

Another physical RFC evaluation performed by Dr. Eric C. Puestow, M.D. dated April

27, 2004 also contained identical conclusions.  (R. 438-45.) With regard to Plaintiff's

alleged symptoms, Dr. Puestow concluded that Plaintiff's symptoms were attributable to

16

a medically determinable impairment but that the severity or duration of the symptoms as reported by Plaintiff was disproportionate to the expected severity or expected duration on the basis of Plaintiff's medically determinable impairments.  (R. 443.)

Thomas Peele, M.D. completed another physical RFC evaluation dated December 3, 2009 that contained identical conclusions to Dr. Steele and Dr. Puestow's earlier evaluations.  (R. 707-14.)  With regard to Plaintiff's alleged symptoms, Dr. Peele concluded that the severity or duration of the symptoms as reported by Plaintiff was disproportionate to the expected severity or expected duration on the basis of Plaintiff's medically determinable impairments and that these subjective allegations exceeded the objective medical evidence.  (R. 712.)

C.    **Hearing Testimony**

The Plaintiff testified at the administrative hearing.  He testified that he does not have a driver's license and does not drive because his doctor had advised him not to do so on account of Plaintiff's reflexes.  (R. 859.)  Plaintiff also stated that he has trouble bathing himself and getting dressed because he has to do both one-handed.  (R. 859.)  He did state that he could probably prepare a microwave dinner or a sandwich.  (R. 859.)  Plaintiff further testified that he could dust a lamp but could not sweep a floor with a broom, vacuum a rug, wash dishes or do laundry due to his neck pain.  (R. 859-60.)

Plaintiff testified that in 1999 he began having serious trouble with his neck.  (R. 852.)  When asked by ALJ Abruzzo when he was first diagnosed with neck problems, he stated that it was in 2003 when he visited the Shands ER.  (R. 852.)  Plaintiff testified that MRI's had revealed that the cause of his neck pain was seven heat strokes that Plaintiff had suffered in his brain, which had caused his spinal column to grow

17

around his spine and also had caused nerve damage.  (R. 852.)  Plaintiff testified that

the abnormal growth of his spinal column had also affected several discs in his neck.

(R. 853.)  He testified that he had surgery and that a fusion cage was put in his neck at

levels 5, 6 and 7.  (R. 853.) Plaintiff stated in response to a question from ALJ Abruzzo

that after the fusion surgery he had "slowly got a little better" to the point where he no

longer had to look at his feet to walk.  (R. 854.)  He also testified, however, that the pain

from his neck was continuous.  (R. 854.)  Plaintiff also testified to back pain that had

required a further two fusion cages to treat.  (R. 856.)

Plaintiff testified that, after his neck problems, his most serious impairment was

his left arm.  (R. 854.)  He stated that his left arm began bothering him after his last

administrative hearing in 2007, or approximately 18 months at the time of his

administrative hearing before ALJ Abruzzo.  (R. 855.)  Plaintiff testified that he cannot

use his left hand at all and that he can only move his arm a little.  (R. 871.)  He uses a

brace on his left arm, which he wore at the administrative hearing.  (R. 871.)

Susanna Roche, a vocational expert, also testified at the hearing.  She testified

that Plaintiff's past relevant work included the positions of construction laborer, masonry

laborer, stacker/operator, industrial truck operator, material handler, and office helper.

(R. 862-867.)  ALJ Abruzzo asked the VE whether a hypothetical individual who was

limited to the following RFC could perform any of Plaintiff's past relevant work: no more

than the light range of exertion; who had to avoid crawling and the climbing of ropes,

scaffolds, and ladders exceeding six feet; no more than occasional work with the head

tilted back; compatible with a sit/stand/walk option, wherein the individual could take no

more than 5 steps from the work station, perform a stretch maneuver, return within one

minute and do so no more than 5 times per hour; limited to occasional pushing and pulling with the lower bilateral extremities, including the operation of pedals unless the pedal requires less than five pounds; avoid prolonged exposure to cold temperature extremes, extreme wetness or humidity for six hours out of an eight hour shift; and avoid unprotected heights.  (R. 867.)

Ms. Roche testified that a hypothetical individual with that RFC could perform the duties of an office helper.  (R. 868.)  When asked by ALJ Abruzzo whether there were any other occupations in either the state or national economy that such a person could perform aside from the position of office helper, Ms. Roche testified that such an individual could perform the positions of counter clerk, routing clerk, food and beverage order clerk and new account interviewer.  (R. 868.)  She further testified that significant numbers of such jobs exist both in Florida and in the national economy.  (R. 868-69.)

### D.   Findings of ALJ Abruzzo

ALJ Abruzzo determined that Plaintiff last met the insured status requirements of the Social Security Act as of December 31, 1999.  (R. 490.)  He further determined that Plaintiff had not engaged in substantial gainful work activity since April 23, 1999.  (R. 490.)  The ALJ found that Plaintiff had the following severe combination of impairments: "status-post cervical/thoracic fusion C3 to T1; mild lumbar disc disease; brain white-matter small vessel ischemia; status-post three left brachial cyst excisions, possible lower extremity neuropathy."  (R. 490-91.)  He also concluded that symptoms related to Plaintiff's left upper extremity pain and weakness, mild mood disorder, and late-onset dysthymic disorder did not, either singly or in combination, have more than a minimal effect on Plaintiff's ability to perform work functions on a sustained basis.  (R. 491.)

19

Accordingly, the ALJ concluded that each of these impairments was non-severe. The ALJ went on to find at step three of the sequential evaluation that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (R. 491.)

With respect to Plaintiff's residual functional capacity at step four of the sequential evaluation, ALJ Abruzzo determined that Plaintiff retained the RFC to perform light work, that is, that Plaintiff must (i) avoid climbing ropes, scaffolds, and ladders over 6 feet high, (ii) that Plaintiff is limited to occasional overhead work or work with his head tilted back, (iii) that Plaintiff is limited to occasional pushing/pulling with the lower bilateral extremities including the operation of pedals unless the pedal requires less than 5 pounds to operate, and (iv) that Plaintiff must avoid prolonged exposure to hot or cold temperature extremes and extreme wetness and humidity as well as unprotected heights.  (R. 492.)  ALJ Abruzzo concluded that Plaintiff's medically determinable impairments could reasonably be expected to produce some of Plaintiff's alleged symptoms but that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were generally not credible.  (R. 499.)

ALJ Abruzzo then concluded that Plaintiff was able to perform his past relevant work as an office helper.  (R. 502.)  ALJ Abruzzo also noted that "should any reviewing authority re-weigh the evidence and determine the office helper position was not past relevant work, the undersigned continues this analysis into an alternative Step 5 decision below."  (R. 502.)  At Step Five, ALJ Abruzzo concluded that considering Plaintiff's age, education, work experience, and RFC, together with the VE's testimony, that there are jobs that exist in significant numbers in the national economy that Plaintiff

20

can perform.  (R. 502.)  Accordingly, ALJ Abruzzo concluded that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  ALJ Abruzzo thus concluded that Plaintiff had not been under a disability at any time from April 23, 1999 through the date of his decision.

## IV.  DISCUSSION

Plaintiff contends that ALJ Abruzzo erred in including the position of office helper as past relevant work at Step Four of the sequential analysis. Further, Plaintiff challenges the ALJ's finding that Plaintiff's subjective complaints of disabling pain were not fully credible.   The Court will discuss each of the two issues in turn.

### A.    Plaintiff's Past Relevant Work

Plaintiff contends that ALJ Abruzzo erred in "sua sponte" deciding that Plaintiff's previous job as an office helper while on work release from prison constituted past relevant work. According to Plaintiff, his description of his duties as office helper at Painter Masonry while on work release was not consistent with the duties listed in the Dictionary of Occupational Titles for the position of office helper and, thus, the ALJ erred in concluding that his position as an office helper was past relevant work.

Plaintiff's argument misconstrues the meaning of past relevant work in the sequential analysis and the function of the DOT in determining whether a claimant can perform past relevant work.   At Step Four of the sequential evaluation, a plaintiff bears the burden of proving he cannot meet the physical and mental demands of his past relevant work, either as he performed it in the past *or* as the work is generally performed in the national economy.  Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir.1986); 20 C.F.R. § 404.1560(b).  As such, a claimant must demonstrate that he

21

cannot perform the job that he actually performed and that he cannot perform the job as the job is generally performed in the national economy. The DOT is relevant to determining the duties of the job as the job is generally performed in the national economy. On the other hand, where, as here, the job actually performed by the plaintiff is different from and less restrictive than the job listed in the DOT the ALJ may compare the plaintiff's RFC with the duties of the job actually performed by the Plaintiff in making his determination whether the plaintiff can perform past relevant work. That is exactly what happened here.

Plaintiff testified at the administrative hearing that he worked with Painter Masonry while he was on work release from prison in late 2006 and early 2007. (R. 845.)  He testified that as his time in work release came to a close he was unsuccessful in finding other employment. (R. 846.)  Because Plaintiff could not find other work, Painter Masonry "decided to, instead of them sending me back, you know, to try to help me out and give me a job there around the shop there to help them out a little." (R. 838-39.)  Notably, with respect to his job duties, he testified that "they would let me work around the office some there, so I kind of helped the mechanic, you know, hand him tools and stuff, or, or – but they would not allow me to lift anything. Matter of fact, if I had to lift anything there, they would have had me arrested, so I would have went right back (INAUDIBLE). That was their agreement with me, not to lift anything, to just, you know, sweep up somewhere or whatever, you know, that needed done around - -" (R. 846.)

ALJ Abruzzo concluded that Plaintiff was able to perform his past relevant work as an office helper. (R. 502.)  In reaching that conclusion ALJ Abruzzo relied upon the

testimony of the VE, who testified that an individual with claimant's vocational profile is capable of performing the duties of office helper, as the plaintiff actually performed  that job during his work release program in 2006.   (R. 502.)  Consequently, whether the duties actually performed by Plaintiff in the work release program were inconsistent with the duties listed in the DOT for office helper or simply did not include all of the duties listed in the DOT for office helper makes no difference. Because the ALJ concluded that Plaintiff could perform the job Plaintiff actually performed in the work release program as an office helper - and not the job as generally performed in the national economy - there was no error in concluding that Plaintiff could perform past relevant work.

The discussion is, however, entirely academic because the ALJ alternatively went on to step five of the sequential analysis, and relying upon the further testimony of the VE, found that Plaintiff could perform other work which exists in significant numbers in the national economy. Thus, even if Plaintiff could not perform his past relevant work as office helper the finding that he was not disabled was still correct because the ALJ concluded at step five that Plaintiff was capable of performing other work which exists in significant numbers in the national economy.  Specifically, ALJ Abruzzo noted that "should any reviewing authority re-weigh the evidence and determine the office helper position was not past relevant work, the undersigned continues this analysis into an alternative Step 5 decision below."  (R. 502.)  At Step Five, the burden shifts to the Commissioner to prove that other jobs exist in the national economy that the claimant can do, given his RFC, age, education and work experience.  Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996).  If the claimant is able to do other work, he is not disabled.

The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence. Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002).

The VE testified in response to a hypothetical question that an individual with Plaintiff's RFC, and vocational profile could perform the occupations of counter clerk, routing clerk, food/beverage order clerk, and new account interviewer.  (R. 503.) According to the VE, each of these jobs exist in significant numbers in Florida and in the national economy.  (R. 503.)  Accordingly, based upon the VE's testimony ALJ Abruzzo concluded that Plaintiff has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy and therefore was not disabled.  (R. 503.) Therefore, even if Plaintiff's past job as an office helper does not constitute past relevant work at step four, the ALJ did not err in finding that Plaintiff was not disabled because the ALJ properly found at step five that Plaintiff could perform other work.

**B.**   **Plaintiff's Credibility**

Plaintiff's second challenge is that ALJ Abruzzo violated the Eleventh Circuit pain standard in finding the Plaintiff was not fully credible. A fundamental problem with Plaintiff's argument is that it is based almost entirely upon medical evidence which concerns medical treatment and examination years after the Plaintiff's date last insured of December 31, 1999.

As part of his credibility finding ALJ Abruzzo concluded that "the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity,

persistence and limiting effects of these symptoms are generally not credible."  (R. 499.) In support of this conclusion the ALJ expressly found that  Plaintiff's "subjective allegations are at times internally inconsistent and frequently inconsistent with the objective medical evidence, and therefore generally not reliable."  (R. 500.)

        Plaintiff entire argument cites exclusively to medical evidence in the record from February 2003 through March 2008. In order to demonstrate that Plaintiff is entitled to Title III disability insurance benefits, however, he must establish that he became disabled prior to the expiration of his insured status.  42 U.S.C. § 423(a)(1)(A), (c)(1). Because the only issue before the Court is whether the Commissioner erred in rejecting Plaintiff's Title II claim, medical evidence that is not contemporaneous with Plaintiff's insured status is relevant only to the extent that it bears upon Plaintiff's condition prior to his date last insured.  Casey v. Secretary of Health and Human Services, 987 F.2d 1230, 1233 (6th Cir. 1993)(evidence dated after date last insured is "outside the scope of our inquiry"); Selk v. Barnhart, 234 F.Supp.2d 1006, 1014-15 (S.D. Iowa 2002)(noting that "subsequent medical, psychological, and psychiatric evaluations are relevant to the extent they reflect upon the claimant's condition as of the date last insured").  Thus, the evidence cited by Plaintiff has at best only marginal relevance to Plaintiff's Title II claim because none of it relates to the severity of Plaintiff's impairments between the alleged onset date of April 23, 1999 and his date last insured of December 31, 1999.

        A review of the medical evidence cited by Plaintiff covering the time period after the expiration of Plaintiff's date last insured, discloses that none of the evidence includes information, examination or diagnoses that relate to the Plaintiff's condition prior to his date last insured, December 31, 1999.  Notably, although Plaintiff testified at

25

the administrative hearing that 1999 was when he "started having so much trouble with my neck," he admitted that the first time he was diagnosed as having some problem with his neck was in 2003 when he visited the Shands ER.  (R. 852.)  Moreover, there is no medical evidence in the record from the year 1999 and the only medical evidence from 1998 in the record are the progress notes from an October 1, 1998 visit to Family Medical Practice for treatment of a rash.  (R. 285.)  The last medical evidence in the record for the period prior to 1999 that specifically relates to Plaintiff's back or neck issues are the records from his July 12, 1995 visit to the North Florida Regional Medical Center ER for pain caused by his cutting down a tree limb.  (R. 252.)

While Plaintiff had spine troubles that eventually required spinal fusion surgery in February 2003 to correct, there is no suggestion in any of the medical evidence from 2000 onward that prior to December 31, 1999 Plaintiff had suffered from the advanced spondylitic myelopathy with canal stenosis and moderate cord compression that necessitated surgery in 2003.  CT scans from December 12, 2000 only showed that Plaintiff had a slight loss of disc height at L3-L4 and probably L5-S1 and mild discogenic disease at L3-L4, L4-L5 and probably L5-S1.  (R. 452.)  There was no suggestion, however, in those scans that these issues rose to a level that required surgical intervention.  (R. 452.)

ALJ Abruzzo extensively reviewed both the pre-1999 and post-1999 medical evidence in the record and determined that it did not support Plaintiff's subjective complaints.  In his decision the ALJ articulated numerous examples supporting his conclusion that Plaintiff's subjective complaints were not credible.  For instance, the ALJ noted that Plaintiff reported to the ER on July 12, 1995 complaining of severe pain,

26

but was able to arise from a back board and walk to the restroom without a limp.  (R. 500.)  Plaintiff also complained of severe lower back pain in June 1994, but MRI scans of his cervical and lumbar spine showed minimal disc bulging without nerve root compression. Plaintiff's treating orthopedist, Dr. Kennedy, concluded that Plaintiff was not suffering from a significant degree of stenosis nor was there significant neural impairment.  (R. 201, 209.)

In addition to his review of the medical evidence, ALJ Abruzzo also relied upon Plaintiff's activities of daily living as support for his conclusion that Plaintiff's subjective complaints were not credible.  For example, Plaintiff reported to personnel at Family Medical Practice in October 1998 that he had acquired a rash after spending time moving large amounts of wood.  (R. 285.)  Similarly, Plaintiff visited the North Florida Regional Medical Center in July 1995 complaining of severe back pain, caused while he was on a ladder cutting down a tree limb.  (R. 252.)  Furthermore, Plaintiff told Shands ER personnel on a March 2004 visit that the source of his reported neck pain was that he had been doing a lot of heavy lifting the previous day.  (R. 405, 408.)  ALJ Abruzzo discussed and cited each of these as examples of activities on Plaintiff's part that were inconsistent with his subjective complaints of disabling pain.

ALJ Abruzzo's determination that Plaintiff's subjective complaints were not credible is further supported by other medical evidence in the record.  A number of Plaintiff's treating physicians commented that Plaintiff claimed to suffer from pain that was inconsistent with his physical symptoms.  For example, on a visit to Dr. Henn on July 31, 2003 Plaintiff reported that he had reinjured his neck while incarcerated and that he was suffering from neck pain.  Dr. Henn noted that "[o]verall, Mr. Douglas is

27

doing quite well" and that "[o]n examination he looks well with good strength in upper and lower extremities." (R. 392-93.) On November 18, 2005 Plaintiff asked for Percocet for what he reported as severe pain from his left neck mass, but was "advised that it is felt that he has been taking too many narcotics for the amount of pain that would be expected for his type of surgery." (R. 777.) The otolaryngologist that removed the left neck mass, Dr. Douglas Villaret, noted on January 6, 2006 that "Patient continues to have excessive amounts of pain that are not common with this procedure." (R. 767.)

Furthermore, in rejecting Plaintiff's subjective complaints of pain, ALJ Abruzzo noted that there was evidence of "drug seeking" behavior. The record more than amply demonstrates that almost every physician who treated Plaintiff expressed concern with the amount of narcotic prescription medication Plaintiff was either taking and/or asking for, and several of the physicians refused to continue writing prescriptions for Plaintiff. This evidence begins as early as 1995 when Dr. Klein raised concerns regarding Plaintiff's substance abuse and continued to as late as March 2008 when Dr. Valenstein raised similar concerns. (R. 214, 661.)

In sum, there is no merit to Plaintiff's contention that the ALJ violated the Eleventh Circuit pain standard in rejecting Plaintiff's credibility. Plaintiff's entire argument relies upon medical evidence, which post dates the date last insured by several years. Moreover, ALJ Abruzzo carefully reviewed and relied upon the medical evidence in determining that Plaintiff's subjective complaints were not credible. And to some degree the ALJ properly noted that the medical evidence suggests that Plaintiff's complaints of pain may have been generated because of "drug seeking" behavior."

Accordingly, the Court concludes that ALJ Abruzzo's rejection of Plaintiff's subjective

complaints of pain was supported by substantial evidence and that ALJ Abruzzo

articulated specific reasons for his credibility finding.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on June 9, 2011.

*s/ Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**